**OUTTEN & GOLDEN LLP**
Kathleen Peratis
Shirley Lin
Amy Biegelsen
685 Third Avenue, 25th Floor
New York, New York  10017
(212) 245-1000

P. David Lopez (*pro hac vice* motion
   forthcoming)
601 Massachusetts Avenue NW
2nd Floor West Suite
Washington, DC 20001
(202) 847-4400

**TRANSGENDER LEGAL DEFENSE &
EDUCATION FUND**
Jillian T. Weiss
20 West 20th Street, Suite 705
New York, New York  10011
(646) 862-9396

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SHINE WILLIAMS,

                    Plaintiff,

          v.

METRO-NORTH RAILROAD COMPANY,

                    Defendant.

**COMPLAINT**

## NATURE OF THE ACTION

1.     Plaintiff Shine Williams ("Mr. Williams") brings this action against Defendant Metro-North Railroad Company ("Metro-North" or "the Company") to seek redress for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL").

2.     Plaintiff Shine Williams is a 43-year-old man.  He is transgender, and his gender identity has been male since he was a child.  His physical appearance is masculine and consistent with his male sex, gender, and gender identity.  Mr. Williams, a friendly and outgoing person, and has for decades been accepted as a man by his family, friends, faith community, and colleagues in former places of work.

3.     The broad acceptance Mr. Williams enjoyed abruptly ended in September 2010 — a few weeks after he started working at Metro-North as a coach cleaner — when Metro-North publicly disclosed Mr. Williams's transgender status in a humiliating manner.  Metro-North told Mr. Williams, among other things, he could no longer use the male locker room and other men's facilities; required him to be identified by a female name he was assigned at birth and as of the "female" sex in all Company documents and communications; and segregated him for more than four years into a substandard, single-use locker room with the sign "Female Foreman" on the door.

4.     Metro-North discriminated against Mr. Williams on account of his sex and gender through multiple, repeated, intentional, and cruel acts of misgendering him, which included communicating to him and others that Mr. Williams was not truly a member of the male gender and by disregarding Mr. Williams's gender identity.

5.     Metro-North's cruel discrimination by misgendering included calling Mr. Williams "she" and "her," and then turning a blind eye when co-workers gleefully joined in doing the same and much worse.

6.     For example, co-workers asked Mr. Williams such things as, "What do you have between your legs, a dick or a pussy?," and targeted him for taunts such as "he-she," "Boys Don't Cry," and "hermaphrodite."  Despite notice, Metro-North did nothing.

7.     Given this climate of impunity, the inevitable occurred:  In October 2016, a coworker sexually assaulted Mr. Williams at a station track in broad daylight by groping his genitals while asking offensive sexual questions and ridiculing him.

8.     Mr. Williams tried to bear this persecution with grace.  He continued to work and made formal complaints internally and with outside agencies.  After extensive investigation that concluded in August 2016, the EEOC found his claims to be meritorious.

9.     The years of malicious, hostile abuse at the hands of Metro-North have taken their toll.  Mr. Williams commenced a disability leave in October 2016 following the sexual assault.

10.    Mr. Williams now brings this action for declaratory, injunctive, and equitable relief, as well as monetary damages, pursuant to Title VII, the NYSHRL, and the NYCHRL.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over Mr. Williams's claims pursuant to 28 U.S.C. § 1331 because this action involves federal questions regarding the deprivation of his right under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

12.    This Court has supplemental jurisdiction over Mr. Williams's claims under the New York State Human Rights Law and New York City Human Rights Law pursuant to 28 U.S.C. § 1367 because these claims are so closely related to Mr. Williams's claims under the Title VII that they form part of the same case or controversy under Article III of the United States Constitution.

13.    Defendant is subject to jurisdiction in New York.  The headquarters of Metro-North are located at 420 Lexington Avenue, New York, New York.

14.    Venue lies in this judicial district pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b)(2) because Defendant's principal place of business is located within the

Southern District of New York and a substantial part of the events or omissions giving rise to the claims in this action, including the unlawful employment practices alleged, occurred therein.

## CONDITIONS PRECEDENT & EEOC CAUSE DETERMINATION

15.  Mr. Williams has exhausted any required administrative remedies and complied with all statutory prerequisites to his Title VII claims.

16.  Mr. Williams filed a charge of sex discrimination and retaliation against Metro-North or about December 24, 2014 with the EEOC.

17.  Mr. Williams filed a second charge of sex discrimination and retaliation against Metro-North on or about April 18, 2016.

18.  After conducting an investigation of Mr. Williams's charges, on August 14, 2016, the EEOC issued a merits determination that there was reasonable cause to believe Defendant engaged in sex-based discrimination in violation of Title VII, attached hereto as Exhibit 1.

19.  The EEOC also found that Mr. Williams had been subjected to retaliation for having complained of discrimination, in violation of Title VII.

20.  The Department of Justice issued Mr. Williams a notice of right to sue with respect to his first charge of discrimination, which he received on or about February 27, 2017.

21.  The Department of Justice issued Mr. Williams a notice of right to sue with respect to his second charge of discrimination, which he received on March 4, 2017.

22.  Plaintiff has filed this complaint within 90 days of his receipt of the right-to-sue notices.

23.  Mr. Williams has mailed a copy to the New York City Commission of Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of § 8-502 of the New York City Administrative Code.

## PARTIES

**Plaintiff**

24.     Mr. Williams is a male citizen of the State of New York.

25.     Mr. Williams resides in New York City.

26.     Since August 2010, Mr. Williams has worked as a coach cleaner at Metro-North.

27.     At all times relevant and material to this action, Plaintiff has been an employee of Defendant within the meaning of Title VII, the NYSHRL, and the NYCHRL, and has been employed in the State of New York.

**Defendant**

28.     Defendant Metro-North Railroad Company is a public benefit corporation.

29.     Metro-North operates and maintains a commuter railroad in New York and Connecticut as part of the largest transportation system in the United States.

30.     At all times relevant to this action, Defendant has maintained a principal place of business in New York, New York.

31.     At all times relevant to this action, Defendant was Plaintiff's employer within the meaning of Title VII, the NYSHRL, and the NYCHRL.

## FACTUAL ALLEGATIONS

**Mr. Williams's Background**

32.     Mr. Williams is a 43-year-old African American man who is transgender.

33.     Mr. Williams had a male gender identity from the time he was a child, presenting himself as male in all aspects of his life.

34.     As a young man in high school, Mr. Williams lived and was accepted as male by his entire community.  He is 5 feet, 10 inches tall and of heavy build.  He has maintained a

muscular physique and, until October 2016, an active weight-lifting regimen at his gym.  He has sported facial hair since early 2010.

36.     Mr. Williams has taken testosterone for many years as an important component of his transition, enabling him to align the external manifestations of his sex and gender with his male gender identity.

36.     By the time Mr. Williams began employment with Metro-North in August 2010, he had been recognized as a man by his family, community, and colleagues for more than two decades.

37.     Mr. Williams's transition from the sex he was assigned at birth was a complex process with significant personal and medical steps, all of which were and are formative and core aspects of his identity.

38.     Before and after August 2010, Mr. Williams used the men's locker rooms and bathrooms at his gym and previous places of employment without a single incident or comment regarding his sex or gender.

39.     Prior to his employment at Metro-North, Mr. Williams's employers and co-workers at his former places of employment addressed him using male pronouns, male titles (such as "Mr."), and his preferred first name, Shine, also without incident.

40.     Mr. Williams had transitioned to male at the time he began employment with Metro-North, which was obvious from all aspects of his self-presentation including his low voice, his dress, his facial hair, his name Shine, his use of male pronouns, his clothing, and his grooming.

**Upon Learning of His Transgender Status, Metro-North Refused to Acknowledge Mr. Williams's Male Identity, Demanded That He Conform to Female Gender for Employment Purposes, and Publicly Held Him Out As "Not A Real Man"**

41.     In August 2010, Mr. Williams completed new employee paperwork for Metro-North consistent with his male gender and male gender identity, and identified himself as male.

42.     Metro-North assigned Mr. Williams to serve as a coach cleaner at its North White Plains station, and assigned him to the men's locker room.  During his first month working for Defendant, his colleagues — including the men — treated him as a peer and equal without any comments regarding his sex, his gender, his gender identity, or his gender expression.

43.     On or about September 23, 2010, Defendant's Director of Employee Relations and Assistant Director of Employee Relations at the time, Wendy Wark and Maryann S. Gormley-O'Connor — allegedly received a report from a supervisor at North White Plains about "a woman using the male locker room."

44.     Upon information and belief, Ms. Wark and Ms. Gormley-O'Connor reviewed Mr. Williams's driver's license in his personnel file, which at the time stated "F" for female. Based upon this information, two high-ranking Human Resources managers, Ms. Wark and Ms. Gormley-O'Connor, decided to incorrectly categorize Mr. Williams as female, not male.

45.     On or about September 29, 2010, Ms. Wark and Ms. Gormley-O'Connor met with Mr. Williams.  Ms. Gormley-O'Connor stated that because his government identification referred to him as "female," the Company would categorize him as female.  She also stated that that Mr. Williams had to complete new personnel forms under the female name that was given to him at birth ("Sheri") but no longer used, and identify himself as "female" in all sex or gender fields.

46.     Ms. Gormley-O'Connor and Ms. Wark then announced that Mr. Williams could no longer use the men's locker room and "had to go to the women's locker room."

47.     Mr. Williams was shocked, and responded first with disbelief.  He told Ms. Gormley-O'Connor and Ms. Wark that assigning him to the North White Plain women's locker room was impossible — and wrong — because he is a man.

48.     Mr. Williams explained to Ms. Gormley-O'Connor and Ms. Wark that he was a man and that it would be unsafe for him, — a muscular, bearded man — to enter the women's locker room.

49.     Mr. Williams further explained to Gormley-O'Connor and Wark that for his own safety, he should be permitted to remain in the men's locker room because his removal would generate "hostility" toward him among his co-workers.

50.     Ms. Gormley-O'Connor replied, "This is a different type of company" and stated that it was Metro-North's "policy" not to treat Mr. Williams as male or permit him to use the men's locker room unless he provided "documents" proving that he is male.

51.     Ms. Wark asked Mr. Williams whether he had any papers proving that he had "had surgery."

52.     Metro-North's HR Department incorrectly and offensively deemed Mr. Williams to be "female," continuing to refer to him as "she" and "her," doing so even in the course of the subsequent EEOC investigation, even though Mr. Williams told them repeatedly that he was male.  Metro-North apparently believed at that time that a person remained the gender assigned at birth until some "surgery" was undertaken and completed, a contention unsupported in any applicable law.

53.     During and after the meeting with Ms. Gormley-O'Connor and Ms. Wark, Metro-North's HR representatives, Mr. Williams became deeply afraid for his safety because these actions would publicly identify him as transgender.  They made clear that the Company would continue to universally refer to him by a female name and using female identifiers on his public-facing documents, including his employee badge, despite the danger and cruelty of doing so.

54.     In early October 2010, a Metro-North supervisor ordered Mr. Williams to empty his possessions from his locker in the men's locker room into a trash bag, and escorted him from the men's locker room, with more than 60 of Mr. Williams's male co-workers looking on.

55.     The supervisor led Mr. Williams to a windowless "locker room" that was a retrofitted broom closet containing a toilet exposed to the rest of the room.  As of his first week in the room, a large hole gaped in the ceiling tile.  The locker room was located approximately 20 feet around the corner from the men's and women's locker rooms.

56.     On the door of the locker room was a sign that said "Female Foreman."  Over the next four years, however, Mr. Williams was the sole occupant of the locker room.  He was humiliated, shamed, and pained every time he walked into that room over the next four years.

57.     During October 2010, Robert Castellano, the station's superintendent informed Mr. Williams that he would not be allowed to use Defendant's men's restrooms until he provided documents showing a "sex change" or "surgery."  The station's highest-ranking supervisor for Mr. Williams, Chief Mechanical Officer Al Cecere, also stated to Mr. Williams that he could not use men's restrooms or locker rooms "until otherwise," meaning until the Company decided that he could.

58.     Mr. Williams made regular and repeated requests that Metro-North remove the "Female Foreman" sign, all of which Metro-North HR and at least three station supervisors ignored.[1]

59.     Word immediately spread among North White Plains employees that Mr. Williams was not "really" a man, and severe repercussions ensued, as are more fully described herein.

60.     Metro-North intentionally and systematically discriminated against Mr. Williams, and knowingly disclosed his transgender status against his will, but Defendant did nothing to address his safety or privacy.

61.     Before Mr. Williams put his complaints of discrimination and retaliation in writing, in 2014, Metro-North never provided any formal training regarding gender identity or the rights of transgender and gender-non-conforming employees to its Mechanical Department employees, including coach cleaners, at North White Plains.  It is doubtful that its own HR representatives, including in particular Ms. Gormley-O'Connor and Ms. Wark, had ever had any training themselves regarding gender identity or the rights of transgender and gender-non-conforming employees.

62.     Metro-North intentionally discriminated against Mr. Williams by assigning him a sex, gender, and gender identity other than his actual sex, gender, and gender identity — male — in every aspect of his employment.  Defendant did so because Mr. Williams is transgender, and therefore perceived him as female and as gender non-conforming.

---

[1]     Mr. Williams initially attempted to cover the "Female Foreman" sign with black electrical tape for several years, but unknown individuals ripped off the tape each time.

63.     By publicly misgendering him as "female" and "other" to all employees,

Defendant openly discriminated against Mr. Williams and wholly undermined his rights to equal

treatment and ability to work.

**Metro-North Was Aware Of, But Intentionally Ignored, Years of Hostile and Abusive Sex-**
**and Gender-Based Harassment Against Mr. Williams**

64.     Soon after Metro-North intentionally discriminated against Mr. Williams and

identified him publicly as transgender, Mr. Williams's co-workers at the station subjected him to

a barrage of insults, ridicule, and antagonism.

65.     In October 2010, shortly after Defendant removed Mr. Williams from the men's

locker room, Mr. Williams told Ms. Gormley-O'Connor, Metro-North's HR representative, that

a carman was harassing him by intentionally and repeatedly referring to him as "he/she" and

"Boys Don't Cry,"[2] and intentionally tracked muddy boots across the floors of trains Mr.

Williams was responsible for cleaning — and just after he had finished cleaning them.  Metro-

North did not address the problem, as this harasser's conduct continued.

66.     On or about October 4, 2011, Mr. Williams formally reported hostile remarks by

another coach cleaner at North White Plains in a meeting with Ms. Gormley-O'Connor.  He

informed her that the harasser called him "he/she," "SheRa" and "Miss"; questioned why Mr.

Williams had his own locker room; and attempted to instigate a fight in which he intentionally

jabbed his elbow into Mr. Williams's stomach — charging into Mr. Williams and causing him to

fall backward — in front of other co-workers at the station.

---

[2]     *Boys Don't Cry* is a 1999 film largely based upon the true story of Brandon Teena, a male
protagonist who is transgender.  In the film, two cisgender men strip, brutally rape, and murder
Mr. Teena.

67.     During this meeting, Mr. Williams also informed Ms. Gormley-O'Connor that the carman continued to engage in name-calling and misuse of gender pronouns.  He requested that Metro-North return him to the men's locker room and tell his male colleagues that Metro-North had been mistaken in removing him.

68.     Metro-North refused, but Ms. Gormley-O'Connor acknowledged that Mr. Williams was alleging his harassment was based upon "gender" and "gender identity," as she checked off those boxes in her file regarding Mr. Williams's 2011 report.  However, Metro-North took no remedial steps whatsoever.

69.     In July 2012, Mr. Williams reported to a supervisor that a second coach cleaner began to purposefully and maliciously call him by incorrect female pronouns, and asked him extremely invasive and hostile questions such as "what do you have between your legs, a dick or a pussy?"  This individual, along with other coach cleaners, continued to freely and intentionally misgender Mr. Williams for purposes of humiliation, and engaged in vulgar, demeaning gossip regarding his genitalia.

70.     During a December 2012 meeting, Mr. Williams told Ms. Gormley-O'Connor that three carmen, including the one he reported in October 2011, made hostile remarks such as "here comes he/she" and "Boys Don't Cry."  Although Mr. Williams provided the names to Metro-North HR with the expectation that it would investigate, Defendant apparently took no remedial action whatsoever and the three men continued to harass Mr. Williams.

71.     In another instance, coach cleaner Ron Williams blew cigarette smoke in Mr. Williams's face, saying "No matter how you change yourself in surgery, that doesn't mean you'll be a man; you will still be a woman."  In 2013, Ron Williams and several other coach cleaners

actively spread offensive rumors at the station that Mr. Williams had gotten "penis surgery" while on medical leave, to further discriminate against him.

72.    In a subsequent interview with the EEOC and DOJ, a co-worker of Mr. Williams confirmed that he heard Ron Williams and two other coach cleaners make sexually derogatory comments about Mr. Williams during his tenure at North White Plains, saying that his "penis was cut off," and asking, "How big is it [his penis]?" and "Did they cut off the breasts?"[3]

73.    As of early 2014, three years of harassment were taking their toll. Mr. Williams' health deteriorated. Mr. Williams was so stressed by the cruelty, the abusive comments, and ostracism that he could no longer work alongside one of his most active harassers.

74.    Thus, in early 2014, Mr. Williams informed Metro-North (by way of his immediate supervisor) that he could not be partnered up with Ron Williams for bathroom dumping assignments, because of Ron Williams's relentless harassment of and discrimination against Plaintiff.

75.    Metro-North refused to make any change and instead partnered Mr. Williams with Ron Williams every Wednesday for this labor-intensive task requiring collaboration and close proximity. Mr. Williams approached two additional supervisors to ask them to make the change, but Metro-North persisted in refusing to make the change.

76.    At all relevant times, Defendant's "Discrimination & Harassment Operating Procedure" stated:

> Supervisors who receive a complaint of discrimination or harassment from a subordinate should consult with [HR] as soon as possible. Supervisors who knowingly condone discrimination or harassment and/or knowingly fail to take appropriate action to

---

[3]    The interviewee stated that as of May 2016, such comments about Mr. Williams continued to be made at Metro-North.

respond to a complaint will be subject to discipline.

77.     On September 24, 2014, a fourth supervisor emailed Nancy Cotto, a Metro-North assistant HR manager.  He informed HR that Mr. Williams complained that Ron Williams engaged in "gender-based harassment" against him; that he would therefore not be able to work with Ron Williams; and that two supervisors responsible for the assignments had been "immediately notified."

78.     Mr. Williams took unpaid time off every Wednesday to avoid having to work in such close proximity to his harasser and co-worker Ron Williams during a dumping partner assignment.  Metro-North never took any remedial or corrective action against Ron Williams or the assigning supervisor.  In July 2015, after Mr. Williams learned from a colleague that a senior coach cleaner referred to him as "it" and "thing," he submitted written complaints regarding sex-based harassment and retaliation against seven co-workers to Metro-North HR.   The complaints included a report that a female coach cleaner stereotyped him as so "sensitive" and "touchy" that he couldn't possibly be a "real man."

79.     Defendant Metro-North performed a sham "investigation," as it refused to interview co-workers who might corroborate Plaintiff's complaints, and ignored substantial evidence supporting Plaintiff's claims.

80.     Metro-North falsely told Mr. Williams his complaints were "unsubstantiated" and failed to take an effective remedial or corrective action.  It did not so much as reprimand a single individual.

**Metro-North Failed to Address Known Retaliation and Further Sex- and Gender-Based Discrimination Against Mr. Williams**

81.     As of late 2013, after Mr. Williams returned from medical leave, he did not get any assignments to valuable overtime shifts.

82.     By the terms of Metro-North's contract with the Transport Workers Union, overtime opportunities must be offered to coach cleaners strictly by order of seniority.

83.     Although Mr. Williams had enough seniority at North While Plains to be called at least twice a week for overtime shifts, as had been the case in 2012, the calls from the senior coach cleaner dropped in late 2013 and ceased altogether between March 2014 and February 2015 because of sex discrimination and retaliation.

84.     Metro-North learned that Mr. Williams had been intentionally passed over for overtime on account of gender bias, and yet Metro-North took no steps whatever to correct this violation.

85.     The North White Plains station remained a hostile work environment after Metro-North HR's investigation, because its failure to hold anyone accountable sent the message that its employees could with impunity harass Mr. Williams or any transgender or gender non-conforming employee.

86.     Mr. Williams's supervisors and colleagues at North White Plains engaged in retaliation and further discrimination against him for having formally reported their behavior to HR and prompting an investigation.  Upon information and belief, Metro-North never issued a non-retaliation instruction to any of its North White Plains employees.

87.     In December 2014, Metro-North conducted a so-called diversity training regarding transgender employees for the coach cleaners at North White Plains.  Mr. Williams was excused from the training, but several individuals present confirmed that his harassers and others present derided the session as a joke, continuing to refer to Mr. Williams as a "he-she" and objecting to being required to refer to him by male pronouns.  This was the first such training Metro-North held anywhere within the Company.

15

88.     In or about December 2014, upon the recommendation of an outside consultant, Metro-North offered to return Mr. Williams to the men's locker room, after having made public his transgender status and spent more than four years intentionally misgendering him.

89.     However, by then the well had been poisoned: In approximately January 2015, when Mr. Williams attempted to walk into the men's locker room, a male co-worker closed the door in his face.

90.     Mr. Williams reasonably believed that on account of all of the years of discrimination and retaliation without any corrective action by Metro-North, he could not now safely return to the North White Plains men's locker room.

**At Grand Central, Metro-North's Continued Failure to Address or Remedy Workplace Hostilities Resulted In the October 8, 2016 Sexual Attack Against Mr. Williams**

91.     On or about December 24, 2014, Mr. Williams filed a charge of sex-based discrimination and retaliation against Metro-North with the EEOC.

92.     Because of the open animosity toward Mr. Williams for having made internal complaints against his colleagues that summer, Mr. Williams began to look into transfers to another station.

93.     On or about January 29, 2015, as Mr. Williams was looking at a sheet posting "bids" — applications for open positions throughout Metro-North — in a public area near the men's locker rooms, a coach cleaner nastily told Ron Williams and a female coach cleaner, "Shine is taking to bid a job to GCT [Grand Central Terminal].  I'm going to put a monkey wrench in that shit and bid it myself and let HER suffer dumping here."  The coach cleaner, who was more senior than Mr. Williams, did bump him to take the opening at Grand Central.

94.     On February 20, 2015, Metro-North granted Mr. Williams's bid for a coach cleaner position in Grand Central Terminal based solely upon his seniority.  Upon information and belief, Defendant did not facilitate Mr. Williams's transfer out of North White Plains.

95.     On February 23, 2015, his third day at the new station, Mr. Williams walked into the Grand Central employee lunch room and heard the coach cleaner who outbid him for the first transfer loudly say, "Y'all know that's a *girl*, right?  You know, that one will go upstairs [i.e., report discrimination to HR] on your ass."

96.     As Mr. Williams heard this and opened the door, the coach cleaner's face turned red, confirming that he was referring to Mr. Williams.  Although Metro-North, upon a consultant's advice, assigned Mr. Williams to the common men's locker room once he transferred Grand Central, it did not ensure his acceptance or safety.

97.     Because of Mr. Williams's relatively lower seniority among coach cleaners at Grand Central, he has fewer opportunities for overtime.  As a result, his earnings have been sharply cut by Metro-North's failure to address the sex- and gender-based discrimination and retaliation he faced at North White Plains.

98.     In March 2015, after having worked only a few days into his new station, one of Mr. Williams's supervisors approached him and told him that she had heard that he reported discrimination and caused an investigation at North White Plains.

99.     The supervisor condescendingly stated that she did not think highly of Mr. Williams's case, saying, "You don't have any witnesses so you don't have no [sic] case."  By raising the subject of his complaint in this manner, this supervisor made clear that his new colleagues at Grand Central were widely discussing and dismissing his civil rights complaints.

100.    In June 2015, Mr. Williams reported to Metro-North offensive comments about him by a female coach cleaner at Grand Central who angrily referred to Mr. Williams as a "he-she" and "the one who think[s] she's a man."  Metro-North incorrectly claimed that it never received his written complaint regarding the conduct of this female coach cleaner.  The Company made this claim even though he submitted the written complaint to HR in the same manner in which he submitted a prior complaint, which HR did receive as it provided a reply (to say that it would not take action).

101.    From December 2015 through approximately April 2016, investigators with the EEOC, in conjunction with the U.S. DOJ, interviewed current and former Metro-North employees in connection with Mr. Williams's first EEOC charge.  Upon information and belief, those individuals whom they contacted, including his harassers, discussed his case with his current colleagues at Grand Central and fostered resentment against him.

102.    Mr. Williams reported each of the above and other incidents to Metro-North HR, which took no prompt or effective remedial action.

103.    As of December 2015, Mr. Williams's supervisors publicly engaged in angry and physically threatening — even violent — behavior toward Mr. Williams in front of his peers without repercussion.

104.    For example, on December 24, 2015, during a meeting with other coach cleaners, a foreman angrily shouted at Mr. Williams.  When Mr. Williams asked why he was yelling at him, the foreman said, "You're just sensitive.  You know why you're sensitive."

105.    In further example, on or about April 1, 2016, a male foreman thrashed and banged on the walls of the train a few feet from Mr. Williams while shouting loudly "Don't you ever walk away from me again!!!  You give me respect!!!  I *try* to give you respect so you give

*me* respect!!" Mr. Williams reported this threatening behavior but Metro-North took no remedial action.

106. As a final example, on October 8, 2016, a female carman at Grand Central, Meldeisha McMillian approached Mr. Williams and two co-workers at a station platform.

107. Ms. McMillian knew Mr. Williams from having worked at North White Plains in late 2010, after Metro-North had forced Mr. Williams from the men's locker room and required him to use female identifiers.

108. Ms. McMillian interrupted Mr. Williams's conversation with the other co-workers to ask offensive questions showing sex- and gender-based animus about surgery for his genitals and breasts.

109. Ms. McMillian then, without permission and before Mr. Williams could object, groped his crotch area with her hand and, through his clothing, squeezed.

110. During the attack, Ms. McMillian continued asking Mr. Williams obscene questions such as, "How does it work?" and "How big is it?"

111. After grabbing Mr. Williams's crotch area, Ms. McMillian proceeded to ridicule what she perceived to be the size of Mr. Williams's penis and refer to him in the third person as a "she."

112. Mr. Williams reported the sexual assault to the police, who reviewed video camera footage and promptly arrested Ms. McMillian.

113. Ms. McMillian is scheduled to stand trial on several criminal charges in connection with the sexual assault in 2017.

114. The Criminal Court also entered an order of protection against Mr. Williams's assailant, including prohibiting further "sexual misconduct, forcible touching, intimidation,

19

threats, or any criminal offense or interference."  Upon information and belief, the order of protection will remain in effect until October 2017.

115.    Ms. McMillian's sexual attack of Mr. Williams occurred because of the environment of impunity and hostility created by the Company.

116.    Regarding the quality of Mr. Williams's performance:  For more than five years, he had an unblemished performance record.  This remained true until the EEOC's investigation of Mr. Williams's claims against Metro-North became widespread knowledge, in or about April 2016.

117.    In March and April 2016, Mr. Williams's direct supervisors, including the one who ridiculed his HR complaint and investigation claimed that he had not adequately cleaned his assigned train cars.

118.    In early April 2016, Mr. Williams was targeted for reprimand for "unsatisfactory attendance," even though his colleagues were not reprimanded for the same practice.

**Metro-North's Reprehensible Conduct Has Caused Mr. Williams Serious Harm**

119.    The stress from the years of discrimination and retaliation has taken a physical and emotional toll on Mr. Williams.  As a direct and proximate result of the illegal discrimination and retaliation alleged herein, he has suffered severe psychological harm.

120.    The October 8, 2016 sexual assault escalated Mr. Williams's psychological pain and suffering.

121.    Mr. Williams commenced a disability leave after the sexual assault due to the severe pain and suffering incurred throughout his employment with Metro-North.

122.    As a result of Defendant's discrimination and retaliation and unwillingness to reprimand individuals who impugned Mr. Williams's character, including by making

demonstrably false statements about him during HR investigative interviews, Mr. Williams has also suffered harm to his reputation and his professional prospects.

123.     Defendant's conduct was willful and wanton, and in conscious and deliberate disregard of Mr. Williams's rights.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Discrimination Because of Sex)**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*)**

124.     Mr. Williams realleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

125.     Title VII prohibits discrimination in the terms and conditions of employment based upon the employee's sex.

126.     As outlined above, Defendant discriminated against Mr. Williams in the terms, conditions, and privileges of employment on the basis of his sex.

127.     The foregoing conduct constitutes illegal, intentional discrimination, and unjustified disparate treatment prohibited by Title VII.

128.     In doing so, Defendant acted maliciously and with reckless indifference to Mr. Williams's right to be free from discrimination based on his sex.

129.     Mr. Williams is entitled to damages as a result of Defendant's unlawful acts, including but not limited to compensatory damages awarded under 42 U.S.C. § 1981a(b) for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, as well as past lost wages and benefits and other past compensatory damages, damages to compensate him for reputational harm, punitive damages, as available, and pre- and post-judgment interest.

130.    Mr. Williams requests relief as hereinafter described.

## SECOND CAUSE OF ACTION
### (Retaliation)
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*)

131.    Mr. Williams incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

132.    Title VII prohibits any employer from retaliating against any employee who has engaged in any activity protected by the statute.

133.    Mr. Williams engaged in protected activities including making internal and external complaints regarding Metro-North's discriminatory practices, sex-based hostile work environment, and retaliation.

134.    Defendant took adverse actions against Mr. Williams with the purpose of retaliating against him because of his opposition to or participation in protected activities, causing Mr. Williams to suffer damages as a result of that conduct.

135.    Metro-North knew that its actions constituted unlawful discrimination and showed willful and/or reckless disregard for Mr. Williams's statutorily protected rights.

136.    Mr. Williams is entitled to damages including, but not limited to compensatory damages awarded under 42 U.S.C. § 1981a(b) for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, as well as past and future lost wages and benefits and other past compensatory damages, damages to compensate him for past and future physical and emotional distress and reputational harm, punitive damages, as available, and pre- and post-judgment interest.

137.    Mr. Williams requests relief as hereinafter described.

### THIRD CAUSE OF ACTION
### (Discrimination Because of Sex)
### (New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*)

138.    Mr. Williams realleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

139.    New York State Human Rights Law prohibits discrimination in the "terms, conditions or privileges of employment" or the discharge of an employee based on the employee's sex.  N.Y. Exec. Law § 296.

140.    Pursuant to 9 N.Y.C.R.R. § 466.13(c)(1), "[t]he term 'sex' when used in the Human Rights Law includes gender identity and the status of being transgender."

141.    Pursuant to 9 N.Y.C.R.R. § 466.13(b)(1), "gender identity" means "having or being perceived as having a gender identity, self-image, appearance, behavior or expression whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the sex assigned to that person at birth."

142.    Pursuant to 9 N.Y.C.R.R. § 466.13(c)(3), "[h]arassment on the basis of a person's gender identity or the status of being transgender is sexual harassment."

143.    As outlined above, Defendant discriminated against Mr. Williams in the terms, conditions, and privileges of employment on the basis of his sex.

144.    The foregoing conduct constitutes illegal, intentional discrimination, and unjustified disparate treatment prohibited by the NYSHRL.

145.    In doing so, Defendant acted maliciously and with reckless indifference to Mr. Williams's right to be free from discrimination based on his sex.

146.    Mr. Williams is entitled to damages as a result of Defendant's unlawful acts, including but not limited to compensatory damages awarded for future pecuniary losses,

emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, past and future lost wages and benefits and other past compensatory damages, damages to compensate him for past and future physical and emotional distress and reputational harm, punitive damages, as available, and pre- and post-judgment interest.

147.   Mr. Williams requests relief as hereinafter described.

**FOURTH CAUSE OF ACTION**
**(Retaliation)**
**(New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*)**

148.   Mr. Williams incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

149.   The NYSHRL prohibits any employer from retaliating against any employee who has engaged in any activity protected by the statute.

150.   Mr. Williams engaged in protected activities including making internal and external complaints regarding Metro-North's discriminatory practices, sex-based hostile work environment, and retaliation.

151.   Defendant took adverse actions against Mr. Williams with the purpose of retaliating against him because of his opposition to or participation in protected activities, causing Mr. Williams to suffer damages as a result of that conduct.

152.   Metro-North knew that its actions constituted unlawful discrimination and showed willful and/or reckless disregard for Mr. Williams's statutorily protected rights.

153.   Mr. Williams is entitled to damages including, but not limited to compensatory damages awarded for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, past and future lost wages and benefits and other past compensatory damages, damages to compensate him for past and future

physical and emotional distress and reputational harm, punitive damages, as available, and pre- and post-judgment interest.

154.    Mr. Williams requests relief as hereinafter described.

## FIFTH CAUSE OF ACTION
### (Discrimination Because of Sex)
### (New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*)

155.    Mr. Williams incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

156.    The New York City Human Rights Law prohibits any employer from discriminating against an employee in the terms and conditions of his employment on the basis of gender.

157.    Pursuant to N.Y.C. Admin. Code § 8-102(23), gender is defined to "include actual or perceived sex and shall also include a person's gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to that person at birth."

158.    The foregoing conduct constitutes illegal, intentional discrimination, and unjustified disparate treatment prohibited by the NYCHRL.

159.    Metro-North knew that its actions constituted unlawful discrimination and showed willful and/or reckless disregard for Mr. Williams's statutorily protected rights.

160.    As a direct and proximate of Defendant's discriminatory acts, Mr. Williams is entitled to damages including, but not limited to compensatory damages awarded for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, past and future lost wages and benefits and other past

compensatory damages, damages to compensate him for past and future physical and emotional distress and reputational harm, punitive damages, as available, and pre- and post-judgment interest.

161.    Mr. Williams requests relief as hereinafter described.

### SIXTH CAUSE OF ACTION
### (Retaliation)
### (New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*)

162.    Mr. Williams incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

163.    The NYCHRL prohibits any employer from retaliating against any employee who has engaged in any activity protected by the statute.

164.    Mr. Williams engaged in protected activities including making internal and external complaints regarding Metro-North's discriminatory practices, gender-based hostile work environment, and retaliation.

165.    Defendant took adverse actions against Mr. Williams with the purpose of retaliating against him because of his opposition to or participation in protected activities, causing Mr. Williams to suffer damages as a result of that conduct.

166.    Metro-North knew that its actions constituted unlawful discrimination and showed willful and/or reckless disregard for Mr. Williams's statutorily protected rights.

167.    Mr. Williams is entitled to damages including, but not limited to compensatory damages awarded for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, past and future lost wages and benefits and other past compensatory damages, damages to compensate him for past and future

physical and emotional distress and reputational harm, punitive damages, as available, and pre- and post-judgment interest.

168.    Mr. Williams requests relief as hereinafter described.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A.  Declaring that the acts, practices, and omissions complained of herein are unlawful and violate Title VII, the NYSHRL, and the NYCHRL;

B.  Enjoining and permanently restraining Defendant from engaging in such conduct;

C.  Directing Defendant to pay Mr. Williams his back pay, front pay, equity awards, compensatory damages including  future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and damages to compensate him for past and future physical and emotional suffering, and pre- and post-judgment interest for violations of Title VII, the NYSHRL, and the NYCHRL;

D.  Directing Defendant to pay exemplary and punitive damages, as available, commensurate with Defendant's ability to pay and sufficient to punish and deter continuation of Defendant's discriminatory and unlawful employment practices;

E.  Directing Defendant to pay an award of damages to be determined at trial, plus pre-judgment interest, to compensate Mr. Williams for harm to his professional and personal reputation;

F.  Awarding Mr. Williams reasonable attorneys' fees and costs as provided by law;

G.  Ordering that Defendant institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of gender, and that it eradicate the effects of their past and present unlawful employment practices;

H.  Appointing a monitor to ensure that Defendant complies with the injunction

provisions of any decree that the Court orders;

I.  Ordering that this Court retain jurisdiction over this action to ensure that Defendant

complies with such a decree; and

J.  Awarding such other legal and equitable relief as this Court deems necessary, just and

proper.

Dated:  New York, New York
        May 22, 2017

                                             Respectfully submitted,


                                             /s/ Kathleen Peratis
                                             Kathleen Peratis

                                             **OUTTEN & GOLDEN LLP**
                                             Kathleen Peratis
                                             Shirley Lin
                                             Amy Biegelsen
                                             685 Third Avenue, 25th Floor
                                             New York, New York  10017
                                             Telephone: (212) 245-1000
                                             Facsimile: (646) 509-2060
                                             KP@outtengolden.com
                                             SL@outtengolden.com
                                             abiegelsen@outtengolden.com

                                             P. David Lopez (*pro hac vice* motion
                                                 forthcoming)
                                             601 Massachusetts Avenue NW
                                             2nd Floor West Suite
                                             Washington, DC 20001
                                             Tel: (202) 847-4400
                                             Facsimile: (202) 847-4410
                                             PDL@outtengolden.com

                                             **TRANSGENDER LEGAL DEFENSE &**
                                             **EDUCATION FUND**
                                             Jillian T. Weiss
                                             20 West 20th Street, Suite 705
                                             New York, New York  10011

Telephone: (646) 862-9396
Facsimile: (646) 930-5654
jweiss@transgenderlegal.org

***Attorneys for Plaintiff***